1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8             FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   FRANCO MACIAS, et al.,              No. 1:18-cv-01634-DAD-JLT

11           Plaintiffs,

12       v.                              ORDER DENYING DEFENDANTS'
                                         MOTION FOR SUMMARY JUDGMENT
13   CITY OF DELANO, et al.,
                                         (Doc. No. 48)
14           Defendants.

15

16          This matter is before the court on a motion for summary judgment filed on behalf of

17   defendants City of Delano and Delano Police Officer Pedro Mendoza pursuant to Federal Rule of

18   Civil Procedure 56.  (Doc. No. 48.)  Pursuant to General Order No. 617 addressing the public

19   health emergency posed by the COVID-19 pandemic, defendants' motion was taken under

20   submission on the papers.  (Doc. No. 49.)  For the reasons explained below, the court will deny

21   defendants' motion for summary judgment.[1]

22   ─────────────────────
     [1]  The undersigned apologizes for the excessive delay in the issuance of this order.  This court's
23   overwhelming caseload has been well publicized and the long-standing lack of judicial resources
     in this district long-ago reached crisis proportion.  While that situation was partially addressed by
24   the U.S. Senate's confirmation of a district judge for one of this court's vacancies on December
     17, 2021, another vacancy on this court with only six authorized district judge positions was
25   created on April 17, 2022.  For over twenty-two months the undersigned was left presiding over
     approximately 1,300 civil cases and criminal matters involving 735 defendants.  That situation
26   resulted in the court not being able to issue orders in submitted civil matters within an acceptable
     period of time and continues even now as the undersigned works through the predictable backlog.
27   This has been frustrating to the court, which fully realizes how incredibly frustrating it is to the
     parties and their counsel.
28

1

**BACKGROUND**

2        This case arises from the lethal shooting of Ernie Macias by a law enforcement officer.

3    On September 10, 2019, plaintiffs Franco Macias and M.M. (members of decedent Ernie Macias'

4    family) filed the operative first amended complaint ("FAC") in this civil action against defendants

5    City of Delano and Officer Mendoza.  (Doc. No. 26.)  The factual background that follows is

6    derived from plaintiffs' FAC, the parties' joint statement of undisputed facts, defendants' motion

7    for summary judgment, plaintiffs' opposition to the motion for summary judgment, and the

8    exhibits filed therewith.  (Doc. Nos. 26, 48, 48-1, 50.)  The facts are undisputed unless otherwise

9    noted.

10        On December 31, 2017, at approximately 9:00 a.m., Ernie Macias was parked in an alley

11   behind his friend Peter Garnica's home in Delano, California.  (FAC at ¶ 1.)  Macias and Garnica

12   observed two police cars appear at each side of the alley, one coming from the north and one from

13   the south.  (*Id.*; Doc. No. 50 at 8.)  The police cars proceeded toward Macias' vehicle, blocking

14   the alley in either direction.  (FAC at ¶ 1.)  Delano Police Officers Bautista and Mendoza were

15   the two officers on the scene, each in their respective police vehicle.  (Doc. No. 48 at 8.)  As the

16   officers approached, Macias got into the driver seat of his vehicle, a red GMC pickup truck, while

17   Garnica stayed standing near the right rear of the truck.  (*Id.*)  The officers got out of their police

18   vehicles and Officer Mendoza approached and performed a pat down search of Garnica after

19   asking for permission to do so.  (Doc. No. 50 at 10.)  During the pat down search, Officer

20   Mendoza found a glass pipe in Garnica's pants pocket, but no other contraband or weapons were

21   discovered.  (*Id.*)  Officer Bautista then approached the driver's side window of the red truck with

22   Macias seated behind the wheel.  (Doc. No. 48 at 8.)  As Officer Bautista approached him,

23   Macias started the truck's engine, and both officers drew their sidearms.  (*Id.*)  Officer Bautista,

24   with gun drawn, ordered Macias to turn off the vehicle.  (*Id.*)  Macias then drove forward a short

25   distance, turned off the truck engine, and then re-started the engine.  (*Id.*)  Turning his attention

26   away from Garnica, Officer Mendoza ordered Macias to stop and to exit the vehicle.  (*Id.*)

27   Although Macias responded "okay, okay, okay," he then shifted the truck into reverse and began

28   driving slowly in the general direction of where Officer Mendoza was standing between the rear

2

of the truck and a fence that bordered the alleyway.  (*Id.* at 9.)  Officer Mendoza again gave orders to stop, but Macias did not turn off the engine.  (Doc. No. 50 at 8.)  The parties dispute *when* the truck came to a complete stop, *whether* Macias placed the truck into park, and *whether* Macias revved his engine as the rear of the truck faced Officer Mendoza.  (Doc. No. 48-1 at 4.)  The parties do not dispute that Officer Mendoza next fired two initial shots into the back windshield of the truck, followed by two additional rounds in quick succession.  (Doc. No. 50 at 8, 10.)  Officer Bautista did not fire his weapon.  After Officer Mendoza fired the four total shots, the truck accelerated and reversed quickly, crashing into the wooden fence as Officer Mendoza moved to his right, out of its way and avoiding harm.  (Doc. No. 48 at 8–9.)  The shots fired by Officer Mendoza hit Macias in the back of his head and neck.  (FAC at ¶ 1.)  Macias died at the scene as a result of those gunshot wounds.  (*Id.*; Doc. No. 48 at 9.)

Plaintiffs Franco Macias and M.M. are the father and the minor child respectively of the decedent.  (FAC at ¶¶ 7–8.)  Based on the alleged facts, plaintiffs filed this civil rights action, asserting the following seven causes of action:  (1) a § 1983 claim against defendant Officer Mendoza for use of excessive force in violation of the Fourth Amendment to the U.S. Constitution; (2) a § 1983 claim against defendant Mendoza for denial of medical care in violation of the Fourth Amendment to the U.S. Constitution; (3) a § 1983 claim against defendant Mendoza for deprivation of familial association in violation of the Fourteenth Amendment to the U.S. Constitution; (4) a § 1983 *Monell* claim against defendant City of Delano; (5) a state law negligence claim for wrongful death against defendant Mendoza; (6) a California Bane Act claim against defendant Mendoza pursuant to California Civil Code § 52.1; and (7) a state law battery claim brought as a survival action against defendant Mendoza.  (*Id.* at 8–15.) [2]

/////

---

[2]  Plaintiffs have agreed to voluntarily dismiss their *Monell* claim as well as their second cause of action for denial of medical care.  (Doc. No. 48 at 2.)  Therefore, those claims will be dismissed without prejudice, and defendant City of Delano, against whom the *Monell* claim was brought, will be dismissed as a defendant from this action.  Defendant Mendoza remains the sole defendant in this action going forward.  Accordingly, henceforth, the court will refer only to "defendant" as opposed to "defendants" when addressing the arguments presented in support of or against the pending motion for summary judgment.

On January 5, 2021, defendant Officer Mendoza filed the pending motion for summary judgment as to all of plaintiffs' claims against him.  (Doc. No. 48.)  Plaintiffs filed an opposition on January 20, 2021.  (Doc. No. 50.)  Defendant filed his reply on January 25, 2021.  (Doc. No. 51.)

## LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

In summary judgment practice, the moving party "initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).  When the non-moving party bears the burden of proof at trial, as plaintiff does here, "the moving party need only prove that there is an absence of evidence to support the non-moving party's case."  *Oracle Corp.*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 325); *see also* Fed. R. Civ. P. 56(c)(1)(B).  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment . . . is satisfied."  *Id.* at 323.

/////

4

1    If the moving party meets its initial responsibility, the burden then shifts to the opposing

2    party to establish that a genuine issue as to any material fact actually does exist.  *See Matsushita*

3    *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to establish the

4    existence of a factual dispute, the opposing party may not rely upon the allegations or denials of

5    its pleadings but is required to tender evidence of specific facts in the form of affidavits or

6    admissible discovery material in support of its contention that the dispute exists.  *See* Fed. R. Civ.

7    P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11; *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773

8    (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for

9    summary judgment.").  The opposing party must demonstrate that the fact in contention is

10   material, i.e., a fact that might affect the outcome of the suit under the governing law.  *See*

11   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec.*

12   *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  The opposing party also must demonstrate

13   the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for

14   the non-moving party.  *See Anderson*, 477 U.S. at 250; *Wool v. Tandem Computs. Inc.*, 818 F.2d

15   1433, 1436 (9th Cir. 1987).

16   In the endeavor to establish the existence of a factual dispute, the opposing party need not

17   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

18   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

19   trial."  *T.W. Elec. Serv.*, 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

20   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

21   *Matsushita*, 475 U.S. at 587 (citations omitted).

22   "In evaluating the evidence to determine whether there is a genuine issue of fact," the

23   court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v.*

24   *Cent. Contra Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing

25   party's obligation to produce a factual predicate from which the inference may be drawn.  *See*

26   *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d

27   898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do

28   more than simply show that there is some metaphysical doubt as to the material facts . . . [w]here

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted).

## DISCUSSION

This case concerns an issue that has been the subject of considerable discussion in Ninth Circuit decisions:  when does a suspect's use of a vehicle become so threatening as to justify the use of deadly force by law enforcement officers?  The case before the court involves a driver who slowly drove his vehicle a few feet forward and then a few feet in reverse after police blocked his parked truck in an alley so that it had nowhere to go.  The driver came to a complete stop but was shot four times and killed.  After the four shots were fired by the police officer, the truck moved quickly in reverse and crashed into a fence where the officer who fired the shots had been standing behind the truck.

In his pending motion for summary judgment, defendant Officer Mendoza argues that plaintiffs have not come forward with any material evidence showing that defendant's use of force was objectively unreasonable.  (Doc. No. 48 at 2.)  Defendant also asserts that he is entitled to summary judgment on qualified immunity grounds; that he was not deliberately indifferent nor acting purposefully in a harmful manner in violation of plaintiffs' Fourteenth Amendment rights; and that plaintiffs have failed to come forward with any evidence in support of their state law claims.  (*Id.*)  The court will begin by addressing defendant Mendoza's argument that he is entitled to summary judgment in his favor on qualified immunity grounds.

A.   **Whether Defendant Mendoza is Entitled to Qualified Immunity on Plaintiffs' Fourth Amendment Excessive Use of Force Claim**

Qualified immunity is an affirmative defense that "shield[s] an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009).  The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* at 231 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015).  To determine whether officers are entitled to qualified immunity requires a two-step

6

inquiry.  "The threshold inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation."  *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Pearson*, 555 U.S. at 232.  It is a defendant's burden to establish that they are entitled to qualified immunity.  *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

      1.    <u>Whether Defendant Mendoza Violated the Decedent's Constitutional Rights</u>

Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  U.S. Const. amend. IV.  "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."  *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted); *see also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law enforcement officer, by means of physical force or show of authority, in some way restrains the liberty of a citizen.").

The Fourth Amendment requires law enforcement officers making an arrest to use only an amount of force that is objectively reasonable in light of the circumstances facing them.  *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 7–8 (1985).  Determining the objective reasonableness of a particular use of force requires balancing "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake."  *Graham*, 490 U.S. at 396 (quoting *Garner*, 471 U.S. at 8).  Under this standard, "'[t]he force which [i]s applied must be balanced against the need for that force; it is the need for force which is at the heart of the *Graham* factors.'"  *Liston v. County of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997) (quoting *Alexander v. City & County of San Francisco*, 29 F.3d 1355, 1367 (9th Cir. 1994)); *see also Velazquez v. City of Long Beach*, 793 F.3d 1010, 1025 (9th Cir. 2015); *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1057 (9th Cir. 2003).  Accordingly, courts must consider the facts and circumstances

7

surrounding an officer's actions in "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Bryan v. MacPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (internal quotations and citation omitted); *see also Scott v. Harris*, 550 U.S. 372, 383–84 (2007); *Deorle v. Rutherford*, 272 F.3d 1272, 1280 (9th Cir. 2001); *Liston*, 120 F.3d at 976.  In the final analysis, "[f]orce is excessive when it is greater than is reasonable under the circumstances." *Santos v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002) (citing *Graham*, 490 U.S. at 395).

"Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396 (internal quotations and citation omitted).  These *Graham* factors, however, are not exhaustive. *George v. Morris*, 736 F.3d 829, 837–38 (9th Cir. 2013).  Because "there are no *per se* rules in the Fourth Amendment excessive force context," *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (*en banc*), courts are to "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan*, 630 F.3d at 826 (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)); *see also Velazquez*, 793 F.3d at 1024 (This "calls for a fact-intensive inquiry requiring attention to all circumstances pertinent to the need for the force used.")  "Other relevant factors include the availability of less intrusive alternatives to the force employed" and "whether proper warnings were given[.]"  *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir. 2011); *see also Deorle*, 272 F.3d at 1284 ("[W]arnings should be given, when feasible, if the use of force may result in serious injury, and . . . the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.").

Finally, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted).  This is because, where appropriate, "[t]he calculus

of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgements—in circumstances that are tense, uncertain, and rapidly evolving––about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.

"[T]he reasonableness of force used is ordinarily a question of fact for the jury."  *Liston*, 120 F.3d at 976 n.10.  In this regard, "[b]ecause the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly."  *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (citation omitted); *see also Green v. City and County of San Francisco.*, 751 F.3d 1039, 1049 (9th Cir. 2014) ("Because this inquiry is inherently fact specific, the 'determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases.'" (citation omitted)).

Here, in considering defendant's motion for summary judgment as to plaintiffs' constitutional claims, each step of the analysis must be undertaken by viewing the facts in a light most favorable to the plaintiffs as the non-moving party.

a.    *Nature of the Intrusion*

Under the *Graham* analysis, the first step is to "assess the quantum of force used to arrest [the suspect] by considering 'the type and amount of force inflicted.'"  *Drummond ex. rel. Drummond*, 343 F.3d at 1056 (quoting *Deorle*, 272 F.3d at 1279).  "The intrusiveness of a seizure by means of deadly force is unmatched."  *Garner*, 471 U.S. at 9.  "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment.'"  *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*, 471 U.S. at 9).

Here, it is undisputed that defendant Officer Mendoza used deadly force when he shot decedent Macias by firing two separate volleys of two shots each at him.  (Doc. No. 48-1 at 4); *see Smith v. City of Hemet*, 394 F.3d 689, 706 (9th Cir. 2005) (*en banc*) (defining deadly force as /////

9

1  force that "creates a substantial risk of causing death or serious bodily injury"); *Blanford v.*

2  *Sacramento County*, 406 F.3d 1110, 1115 n.9 (9th Cir. 2005).

3                    b.      *Governmental Interests*

4          Having identified the quantum of force at issue, the court must balance the use of that

5  force against the need for such force.  *See Glenn*, 673 F.3d at 871; *Bryan*, 630 F.3d at 823–24;

6  *Liston*, 120 F.3d at 976.  This next step of the inquiry requires identification of the government's

7  countervailing interests at stake.  *Graham*, 490 U.S. at 396.  "Relevant factors to this inquiry

8  include, but are not limited to 'the severity of the crime at issue, whether the suspect poses an

9  immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

10  or attempting to evade arrest by flight.'"  *Blankenhorn v. City of Orange*, 485 F.3d 463, 477 (9th

11  Cir. 2007) (quoting *Graham*, 490 U.S. at 396); *see also Estate of Diaz v. City of Anaheim*, 840

12  F.3d 592, 605 (9th Cir. 2016); *Glenn*, 673 F.3d at 872; *Mattos*, 661 F.3d at 441; *Deorle*, 272 F.3d

13  at 1280.  The most important of these three factors is whether the suspect poses an immediate

14  threat to the safety of the officers or others.  *Vos v. City of Newport Beach*, 892 F.3d 1024, 1031–

15  32 (9th Cir. 2018); *Mattos*, 661 F.3d at 441.  In cases involving use of deadly force against a

16  fleeing suspect, "the Supreme Court has crafted a more definitive rule," allowing an officer to use

17  deadly force "only if 'the officer has probable cause to believe that the suspect poses a threat of

18  serious physical harm, either to the officer or to others.'"  *Orn v. City of Tacoma*, 949 F.3d 1167,

19  1174 (9th Cir. 2020) (quoting *Garner*, 471 U.S. at 11).  "A suspect may pose a threat of serious

20  physical harm 'if "there is probable cause to believe that he has committed a crime involving the

21  infliction or threatened infliction of serious physical harm," or if the suspect threatens the officer

22  or others with a weapon capable of inflicting such harm.'"  *Villanueva v. California*, 986 F.3d

23  1158, 1169 (9th Cir. 2021) (quoting *Orn*, 949 F.3d at 1174) (cleaned up and citation omitted).

24                    i.      Severity of the Crime

25          If an officer has "probable cause to believe that [a suspect] has committed a crime

26  involving the infliction or threatened infliction of serious physical harm, deadly force may be

27  used if necessary to prevent escape, and if, where feasible, some warning has been given."

28  *Garner*, 471 U.S. at 11–12.  Here, the evidence on summary judgment, viewed in the light most

favorable to plaintiffs, establishes that the decedent was not suspected of having committed a serious crime.  In fact, Mr. Macias was not suspected of committing *any* crime, let alone a violent crime.  In moving for summary judgment, defendant Officer Mendoza asserts that he had known about a recent murder in the area of the shooting (Doc. No. 48-1 at 2), but defendant offers no evidence suggesting Macias had any involvement in that crime or was suspected of having involvement in it.  Nor does defendant Mendoza even suggest he undertook his actions in the alley that day based on any connection to the murder he now mentions.  At most, Mr. Macias was accused of parking his car in an empty alley, a municipal parking violation at worst.  (Doc. No. 50-2 at 14) ("I stopped my vehicle and that's when I noticed the Vehicle Code violation—well, the City violation of parking vehicles in the alleyway, so I said, well, that's going to be a reason for me to contact these folks.")

Accordingly, the evidence before the court on summary judgment with respect to any suspected crime does not suggest that a strong government interest was at stake here and thus also cannot support a finding that the deadly force employed was reasonable as a matter of law.

ii.     Immediate Threat

In continuing to evaluate the governmental interests alleged by defendant to justify the use of force here, the court next turns to whether the decedent posed an immediate threat to the safety of defendant Officer Mendoza.  "Law enforcement officials may not [use deadly force against] suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."  *Harris v. Roderick*, 126 F.3d 1189, 1204 (9th Cir. 1997).  Defendant Mendoza argues that his use of deadly force did not violate the Fourth Amendment as a matter of law because Macias threatened him with a deadly weapon, namely his truck, and that any reasonable officer in his position would have believed that Macias posed an immediate threat of serious harm or death to defendant Mendoza.  (Doc. No. 48 at 15.)

"A moving vehicle can of course pose a threat of serious physical harm, but only if someone is at risk of being struck by it."  *Orn*, 949 F.3d at 1174.  "Use of deadly force to stop a recklessly speeding vehicle during a car chase is therefore ordinarily reasonable under the Fourth Amendment."  *Villanueva*, 986 F.3d at 1170 (citing *Mullenix*, 577 U.S. at 15 ("The Court has thus

11

1   never found the use of deadly force in connection with a dangerous car chase to violate the Fourth

2   Amendment.")); *see also Scott*, 550 U.S. at 386 ("A police officer's attempt to terminate a

3   dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the

4   Fourth Amendment.").

5       However, as in *Villanueva*, this case does *not* involve a police shooting during a high-

6   speed chase. *Villanueva*, 986 F.3d at 1170. It is undisputed on summary judgment that decedent

7   Macias brought the truck to a complete stop before defendant Mendoza employed lethal force

8   against him. (Doc. No. 48-1 at 4) (Mendoza Dash Cam. at 2:32.) The Ninth Circuit has

9   "consistently found use of deadly force to stop a slow-moving vehicle unreasonable when the

10   officers could have easily stepped out of the vehicle's path to avoid danger." *Villanueva*, 986

11   F.3d at 1170 (citing *Orn*, 949 F.3d at 1175 ("Orn's vehicle was moving at just five miles per

12   hour. [The officer] could therefore have avoided any risk of being struck by simply taking a step

13   back.")); *see also Acosta v. City & County of San Francisco*, 83 F.3d 1143, 1146 (9th Cir. 1996),

14   *as amended* (June 18, 1996), *abrogated on other grounds by Saucier v. Katz*, 533 U.S. 194, 121

15   (2001) (finding that a reasonable officer "would have recognized that he could avoid being

16   injured when the car moved slowly, by simply stepping to the side").

17       In contrast, the Ninth Circuit has found the use of deadly force against a stopped or slow-

18   moving vehicle to be reasonable only when the driver was trying to evade arrest in an aggressive

19   manner involving the attempted or actual acceleration of the vehicle. *See Monzon v. City of*

20   *Murrieta*, 978 F.3d 1150, 1161 (9th Cir. 2020) (finding the use of deadly force to be reasonable

21   when "the van's event data recorder, or 'black box,' show[ed] that the van's acceleration pedal

22   was *repeatedly* pressed down between 80 and 99 percent during the very short 4.5 seconds from

23   start to impact, and the van reached a speed of over 17 mph before hitting [the officer]'s cruiser");

24   *Wilkinson v. Torres*, 610 F.3d 546, 551-53 (9th Cir. 2010) (finding deadly force to be reasonable

25   where the officer "was standing in a slippery yard with a minivan accelerating around him"); *see*

26   *also Plumhoff v. Rickard*, 572 U.S. 765, 776 (2014) (finding the use of deadly force to be

27   reasonable where "the front bumper of [the driver's] car was flush with that of one of the police

28   /////

12

1    cruisers, [the driver] was obviously pushing down on the accelerator because the car's wheels

2    were spinning, and then [the driver] threw the car into reverse 'in an attempt to escape.'").

3        As was the case in *Villanueva*, the crucial question here is whether decedent Macias

4    accelerated or *attempted* to accelerate (i.e. revved the engine) toward Officer Mendoza before

5    Mendoza shot Macias through the tinted back window of the truck.  *See Villanueva*, 986 F.3d at

6    1169; *see also Monzon*, 978 F.3d at 1158 ("Even though it was no longer moving, just as in

7    *Wilkinson*, these officers 'could hear the engine revving' and they were now situated on all sides

8    of a van containing 'a driver desperate to escape . . . .'"); *Wilkinson*, 610 F.3d at 551–53.  Only if

9    Macias was doing so could Officer Mendoza possess an objectively reasonable basis for believing

10   that Macias posed a threat of serious physical harm—either to Officer Mendoza himself or to

11   others—because the truck was otherwise stopped.  *See Villanueva*, 986 F.3d at 1169.

12       It is undisputed on summary judgment that Macias drove forward a few feet in the

13   direction of Officer Bautista, then reversed and drove backward a few feet in the direction of

14   Officer Mendoza.  (Doc. No. 48-1 at 3–4.)  The video dash cam footage shows as much.

15   However, it is likewise undisputed that Macias brought the truck to a complete stop after

16   reversing a few feet in the direction of Officer Mendoza.  (*Id.* at 4.)  What happened next is

17   disputed and remains for the jury to decide.  Defendant contends that Macias revved his engine,

18   which caused Officer Mendoza to discharge his weapon in a preventative effort.  (Doc. No. 48 at

19   9.)  Defendant further asserts that decedent Macias then accelerated quickly in an attempt to hit

20   Officer Mendoza.  (*Id.*)  In contrast, plaintiffs contend that Macias had placed the car in park prior

21   to the shooting.  (Doc. No. 50 at 17.)  It is plaintiffs' contention that defendant Mendoza shot

22   Macias while the truck was in park, which caused Macias, who had been killed instantly, to go

23   limp, pulling the gearshift two notches down into reverse and collapsing onto the accelerator.

24   (*Id.*)

25       As an initial matter, the court notes that the video footage does little to clarify the parties'

26   factual dispute in this regard.  Unfortunately, the video dash footage before the court is without

27   sound.  Nevertheless, a reasonable jury could at a minimum determine that the truck driven by

28   /////

                                    13

1    decedent Macias did not lurch in reverse until after Officer Mendoza fired his weapon and moved

2    out of the way of the truck.  (Bautista Dash Cam. 1:49–1:53.)

3           The non-video, testimonial evidence before the court is also disputed in this regard and

4    resolution of that factual dispute requires a credibility finding, something the court obviously

5    cannot engage in on summary judgment.  *See, e.g.*, *Santos*, 287 F.3d at 852 ("[T]he resolution of

6    disputed questions of fact and determinations of credibility . . . are manifestly the province of a

7    jury.") (citation omitted); *Newmaker v. City of Fortuna*, 842 F.3d 1108, 1117 (9th Cir. 2016)

8    ("Because this case requires a jury to sift through disputed factual contentions . . . summary

9    judgment was inappropriate.").

10          For example, Officer Bautista has stated in his sworn declaration that "Officer Mendoza

11   quickly discharged his handgun as it appeared that Macias briefly began to slow the truck to a

12   stop."  (Doc. No. 48-3 at 3.)  In contrast, Mr. Garnica testified at his deposition that "[a]s soon as

13   [Macias] puts the truck in park, four shots rang out . . . he flinches forward, and the last thing he

14   does is I could see him pull the gearshift down and the truck just starts to roll back and it hits the

15   fence, but I mean—he was already dead, though, you know."  (Doc. No. 50-3 at 6–7.)  As to why

16   he believed the truck was in park when Macias was shot, Garnica testified at deposition that:

17
              [T]he reverse lights were on, the brake lights were on, and when he
18            put the truck in park, the reverse lights turned off but the—he still
              had his foot on the brake and that's when the four shots rang out . . .
19            . [W]hen he got shot, when he flew forward and I seen (sic) the
              silhouette of his shadow pull the gearshift down and the truck started
20            to roll back.

21                                          ***

22            [W]hen the reverse lights turn on, he went up.  So what's after reverse
              when you go up?  If he went up once after reverse, that's park.  Right?
23            I mean I'm assuming.  Right?  I don't know what kind of vehicle you
              drive, but after reverse—it's park.

24                                          ***

25            [Also] when he was shot . . . he went down two gears.  I could see.
              It was clear as day.  You know, I wish I could forget it, but he went
26            down two.  So that's, you know, reverse and neutral, whatever it was,
              but he went down.

27                                          ***

28

                                           14

> I don't know if it was two . . . he flinched forward, his body flinched forward, and he pull the thing, the next thing you know the truck's rolling back.

(*Id.* at 8, 14–15.)  Garnica further testified that from his point of view Officer Mendoza was never in any danger.  (*Id.* at 7.)

Defendant Mendoza, on the other hand, testified at his deposition that Macias "[stopped] momentarily and then again I hear the engine accelerate, however slight, and I fired."  (Doc. No. 48-5 at 8.)  "'But the vehicle doesn't move; does it?' 'It's stationary but the engine is running' 'Okay.  And then you fire?' 'Then I fire.'"  (*Id.*)  Based on this evidence, it clearly remains in dispute whether the truck driven by Macias was moving toward defendant Officer Mendoza at all when Mendoza fired, whether the truck was stationary in park, and whether Macias pressed the accelerator before or after Officer Mendoza shot and killed him.

Further highlighting these material factual disputes, plaintiffs cite to several witness statements summarized in the Kern County District Attorney investigation report regarding this shooting.  (Doc. No. 50-4.)  The court finds the following statements that are reflected in that report relevant to the disputed issues:  "[Juan] Banuelos stated he heard 3 shots 'juntos' (together) and then heard a V8 truck accelerate.  I asked him to clarify and he stated he heard an engine revving."  (*Id.* at 19.)  "I contacted Maria Banuelos . . . and she stated she heard 3 shots and then heard a vehicle."  (*Id.* at 20.)  "I contacted Daniella Estrada . . . and she stated she heard 3–4 shots and then heard a car accelerate.  Estrada stated she heard the engine to a vehicle accelerate."  (*Id.*)  "[Erica] Saldana stated she heard 3 fast gunshots that sounded like 'pop, pop, pop.'  She then heard the engine of a vehicle as if someone was speeding away immediately after."  (*Id.*)  In contrast to these witness statements, "Bernice [Alejo] stated she heard a loud exhaust before the gunshots."  (*Id.* at 22.)

Defendant objects to the court's consideration of these statements contained with the District Attorney's report of investigation, arguing that they are hearsay statements that cannot be introduced for the truth of the matter asserted, namely that the shots were fired before the engine of the truck revved.  (Doc. No. 51 at 3.)  It is the case that these statements in their current form would constitute inadmissible hearsay.  Nevertheless, on summary judgment the evidence need

1    not be presented in a *form* that would be admissible at trial.  Rather, "[a]t the summary judgment

2    stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the

3    admissibility of its contents."  *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003) (citing

4    *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001)).  The witness statements

5    reflected in the District Attorney's report of investigation are firsthand witness impressions of the

6    events in dispute.  If plaintiffs were to call these witnesses to testify at trial, their statements

7    would certainly be admissible as their own observations and would, of course, not constitute

8    inadmissible hearsay.  In any event, the court concludes that Mr. Garnica's deposition testimony

9    alone is sufficient to establish the existence of a disputed issue of material fact as to whether the

10   engine of the truck driven by decedent Macias revved before the shots were fired by Officer

11   Mendoza.  Garnica's testimony in this regard contradicts and calls into question the credibility of

12   defendant Mendoza's testimony.  *See T.W. Elec. Serv., Inc.*, 809 F.2d at 630 ("[A]t this [summary

13   judgment] stage of the litigation, the judge does not weigh conflicting evidence with respect to a

14   material fact.  Nor does the judge make credibility determinations with respect to statements

15   made in affidavits, answers to interrogatories, admissions, or depositions.").

16        Defendant repeatedly cites the Ninth Circuit's decision in *Monzon* as supporting his

17   contention that the use of lethal force was reasonable as a matter of law in this case.  (Doc. No. 48

18   at 13.)  But the facts in this action are significantly and critically different than those that were

19   presented in *Monzon*.  In *Monzon*, the shooting immediately followed an erratic, high-speed (100

20   mph) car chase and took place at almost 2:00 in the morning on an unlit street.  *Monzon*, 978 F.3d

21   at 1154.  Indeed, the Ninth Circuit in *Monzon* specifically highlighted that the court "[could not]

22   ignore that [the suspect] rebuffed [the officer's] initial attempt to perform a traffic stop and drove

23   away at speeds of up to 100 mph, endangering the pursuing officers and the general public."  978

24   F.3d at 1157.  The Ninth Circuit in that case also considered "how [the suspect] recklessly exited

25   and reentered the freeway, drove through stop signs and red lights, and steered the van near and

26   toward officers (who were on foot) on the dark, dead-end street."  *Id.*  Additionally, the van in

27   *Monzon* was reported stolen prior to leading officers on the high-speed chase.  *Id.* at 1154.  These

28   factors greatly increased the threat that the suspect posed to both officers and the public.  In

16

contrast, under the evidence as summarized above in this case, Macias never engaged in any car chase. In fact, his car never moved more than a few feet. Moreover, the incident occurred in broad daylight, as evidenced by the video footage presented on summary judgment. (*See* Mendoza Dash Cam.) Finally, in *Monzon* it was "undisputed . . . that the van's acceleration pedal was *repeatedly* pressed down between 80 and 99 percent during the very short 4.5 seconds from start to impact, and the van reached a speed of over 17 mph before hitting [the officer's] cruiser." *Monzon*, 978 F.3d at 1155. In short, the evidence before this court on summary judgment is nothing like the evidence confronted by the court in *Monzon* and the disputed issues of material fact preclude the granting of defendant's motion for summary judgment.

Viewing the facts in the light most favorable to plaintiffs, as the court must on summary judgment here, and giving due deference to Officer Mendoza's assessment of the danger presented by the situation he confronted, *see Ryburn v. Huff*, 565 U.S 469, 477 (2012), the court concludes that plaintiffs have come forward with sufficient evidence such that a reasonable jury could find that decedent Macias did not accelerate or attempt to accelerate the truck before Officer Mendoza shot and killed him. A jury therefore could find that Officer Mendoza's use of force was not objectively reasonable in light of the threat presented. Accordingly, the immediate threat factor also weighs against finding a strong government interest justifying the use of force.

### iii.    Active Resistance or Flight

Although active resistance is a factor to be considered under *Graham*, "where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Roderick*, 126 F.3d at 1201 (quoting *Garner*, 471 U.S. at 11). "It is not better that all felony suspects die than that they escape." *Garner*, 471 U.S. at 11; *see also Roderick*, 126 F.3d at 1204 ("Other means exist for bringing the offender to justice, even if additional time and effort are required.")

First, for the reasons explained above, in this case a jury could reasonably find that Macias did not pose an immediate threat to Officer Mendoza. Second, defendant notably has not argued that his use of deadly force was premised on any notion that permitting Macias to escape could have posed a threat to the safety of the general public. Nor is there any basis in the record for

17

1    making such an argument.  "A fleeing suspect's escape can pose a threat to the public when

2    police have probable cause to believe that the suspect has committed a violent crime," but neither

3    the municipal parking violation observed by officers here nor any of Macias' efforts to arguably

4    attempt to evade capture qualify as violent crimes.  *Orn*, 949 F.3d at 1176.

5         A threat to the public can also exist when the suspect has driven in a way that puts the

6    lives of pedestrians or other motorists at risk, such as by leading officers on a high-speed chase.

7    *See id.* (citing *Mullenix*, 577 U.S. at 12–13).  "In such cases officers have an interest in

8    terminating the suspect's flight because the flight itself poses a threat of serious physical harm to

9    others."  *Id.*  "But to warrant the use of deadly force, a motorist's prior interactions with police

10   must have demonstrated that 'he either was willing to injure an officer that got in the way of

11   escape or was willing to persist in extremely reckless behavior that threatened the lives of all

12   those around.'"  *Id* at 1177 (quoting *Latits v. Phillips*, 878 F.3d 541, 548 (6th Cir. 2017) (internal

13   quotation marks omitted)).  In the cases where courts have found the use of deadly force to be

14   reasonable, "the suspect's conduct before the shooting demonstrated that 'he was likely to

15   continue to threaten the lives of those around him in his attempt to escape.'"  *Id.* at 1180 (citing

16   *Smith v. Cupp*, 430 F.3d 766,775 (6th Cir. 2005)).  Here, decedent Macias engaged in no such

17   actions.  There was no car chase, nor was there any risk posed here to pedestrians.  Although the

18   decedent's decision to start the truck's engine and move that vehicle a few feet forward and

19   backward may perhaps suggest the beginnings of panic setting in, his actions never reached the

20   point of such extremely reckless behavior that defendant Mendoza's use of lethal force would

21   unquestionably be justified on this basis.  This conclusion is compelled when comparing the

22   undisputed facts here to those in other cases where courts have found deadly force to be

23   *unreasonable*.  *See, e.g.*, *Orn*, 949 F.3d at 1172 (a suspect leading officers on 15 minute slow

24   speed pursuit, driving onto a curb and down a closed roadway to avoid officers, and crashing into

25   officers' cars in an attempt to swerve around them); *Cordova v. Aragon*, 569 F.3d 1183, 1186,

26   1190 (10th Cir. 2009) (a suspect running two red lights, crossing onto the wrong side of a

27   highway, and attempting to ram police vehicles on two occasions); *see also Lytle v. Bexar*

28   /////

18

1    *County*, 560 F.3d 404, 407, 413 (5th Cir. 2009) (a suspect speeding through a residential area and

2    colliding with a car in an oncoming lane of traffic).

3           Accordingly, although the evidence on summary judgment suggests that decedent Macias

4    initially may have made efforts to resist arrest or to contemplate flight, consideration of this factor

5    still only weighs slightly in favor of defendant with respect to any government interest present

6    and is not so compelling as to justify the granting of summary judgment.

7                              iv.     Other Factors

8           The only other factor the parties raise in their briefing on the pending motion is that

9    plaintiffs contend defendant Mendoza failed to follow Delano Police Department (DPD) policies.

10   (Doc. No. 50 at 7.)  Plaintiffs assert that the DPD use of deadly force policy "discouraged

11   shooting at or from a moving vehicle because such practices are rarely effective."  (*Id.*)  While

12   "not dispositive," courts "may consider a police department's own guidelines when evaluating

13   whether a particular use of force is constitutionally unreasonable."  *Drummond ex rel.*

14   *Drummond*, 343 F.3d at 1059.  The DPD policy manual does state that shots fired at a moving

15   vehicle are rarely effective and are generally discouraged.  (Doc. No. 50-8 at 2.)  Indeed, the

16   manual also provides that officers "are expected to move out of the path of any approaching

17   vehicle" unless it appears that it would endanger officers or the public.  (*Id.* at 3.)  But the manual

18   ultimately outlines more or less the same standards that the Ninth Circuit has considered when

19   analyzing the reasonableness of the deployment of lethal force:  "This is not intended to restrict

20   an officer's right to use deadly force . . . when it is reasonably perceived that the vehicle is being

21   used as a weapon against the officer or others."  (*Id.*)  Accordingly, any arguments made by the

22   parties with regard to the DPD policies are sufficiently addressed by the court in its consideration

23   of the aforementioned factors.

24                     c.     *Balancing Test*

25           *Graham* requires application of a balancing test to determine "whether the degree of force

26   used was warranted by the governmental interest at stake."  *Deorle*, 272 F.3d at 1282.  The

27   ultimate question in all such cases is whether the use of force was "objectively reasonable in light

28   of the facts and circumstances confronting" the arresting officer.  *Graham*, 490 U.S. at 397.

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotations and citations omitted). As stated at the outset of this analysis, "'it is the need for force which is at the heart of the *Graham* factors.'" *Liston*, 120 F.3d at 976 (quoting *Alexander*, 29 F.3d at 1367); *see also Blankenhorn*, 485 F.3d at 480. However, where inferences must be drawn from disputed material facts, summary judgment in a case in which the use of excessive force is alleged should be denied. *See Green*, 751 F.3d at 1049; *Avina*, 681 F.3d at 1130; *Liston*, 120 F.3d at 976 n.10.

As in *Villanueva*, here defendant's argument rests entirely on the reasonableness of Officer Mendoza's fear that decedent Macias would intentionally hit him with his truck. 986 F.3d at 1170–72. Defendant Officer Mendoza does not argue that he had probable cause to believe that Macias had committed a crime involving the infliction or threatened infliction of serious physical harm; indeed, he acknowledges that the only crimes he and his fellow officer observed Macias commit were mere municipal parking violations. Nor does defendant Officer Mendoza argue that he was concerned for the safety of others. He had no reason to believe Macias was in possession of a firearm[3] and "no evidence indicates that any person other than the Officers were directly in or near the path of the car when [Mendoza] fired." *Id.* at 1169 n.8.

Here, "the need for force" in response to any potential threat hangs on at least four disputed material facts: (1) whether defendant Officer Mendoza reasonably believed that decedent Macias posed a threat to his safety when the truck had come to a complete stop; (2) whether defendant Mendoza could have easily moved out of the way of the truck as it briefly moved; (3) whether Macias revved his engine prior to defendant Mendoza's use of lethal force; and (4) whether the truck started moving toward defendant Mendoza before or after he fired his lethal shots. These are all disputed issues of material fact that must be decided by a jury.

---

[3] The court recognizes that a firearm was found in the truck after Macias was shot and incapacitated, but nothing in the record before the court on summary judgment suggests that the officers had reason to know this fact prior to the shooting.

1    Because genuine disputes of material fact exist as to "whether the degree of force used was

2    warranted by the government interest at stake," *Deorle*, 272 F.3d at 1282, summary judgment in

3    favor of defendant as to plaintiffs' claim of excessive use of force in violation of the decedent's

4    Fourth Amendment rights must be denied.

5             2.      Whether the Decedent's Constitutional Right was Clearly Established

6        The court turns next to the second step of the qualified immunity analysis on summary

7    judgment, which asks whether the decedent's right to be free from the use of excessive force was

8    clearly established at the time of the shooting.  *See Orn*, 949 F.3d at 1178.

9        "A law is clearly established if 'at the time of the officer's conduct, the law was

10    sufficiently clear that every reasonable official would understand that what he is doing is

11    unlawful.'" *Villanueva*, 986 F.3d at 1165 (quoting *District of Columbia v. Wesby*, __U.S.__, 138

12    S. Ct. 577, 589 (2018)).  "[C]ourts must not 'define clearly established law at a high level of

13    generality, since doing so avoids the crucial question whether the official acted reasonably in the

14    particular circumstances that he or she faced.'" *Wesby*, 138 S. Ct. at 590 (quoting *Plumhoff*, 572

15    U.S. at 779).  "While there does not have to be 'a case directly on point,' existing precedent must

16    place the lawfulness of the [conduct] 'beyond debate.'"  *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S.

17    731, 741 (2011)).  However, "[p]recedent involving similar facts can help move a case beyond

18    the otherwise 'hazy border between excessive and acceptable force' and thereby provide an

19    officer notice that a specific use of force is unlawful." *Kisela v. Hughes*, __U.S.__, 138 S. Ct.

20    1148, 1153 (2018) (quoting *Mullenix*, 577 U.S. at 18).[4]

21        Here, plaintiffs have come forward on summary judgment with sufficient evidence

22    showing that the decedent's car was initially stopped.  Moreover, plaintiffs have pointed to

23    evidence that raises disputed material facts regarding when the truck accelerated, where defendant

24

---

25    [4]  Of course, "[i]n an 'obvious case,' the general standards established in *Garner* and *Graham* can suffice to put an officer on notice that his conduct is unlawful." *Orn*, 949 F.3d at 1178 (quoting

26    *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).  Moreover, "[t]he determination of whether a reasonable officer could have believed his conduct was lawful is a determination of law that can

27    be decided on summary judgment only if the material facts are undisputed."  *LaLonde v. County of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000).  If "there is a material dispute as to the facts

28    regarding what the officer or the plaintiff actually did, the case must proceed to trial[.]"  *Id.*

1   Officer Mendoza was located in relation to the truck, and whether the decedent revved the truck's

2   engine before defendant Mendoza fired his weapon.  Viewed in the light most favorable to

3   plaintiffs, defendant Officer Mendoza could have easily moved out of the way of the truck;

4   defendant Mendoza fired his weapon before the truck accelerated toward him; his lethal shots

5   caused Macias' foot to press down on the gas pedal; and decedent Macias did not rev the engine

6   of the truck before being shot.  If these disputed facts were resolved by the finder of fact in

7   plaintiffs' favor, it would be evident that defendant Mendoza's use of deadly force was clearly

8   established as unreasonable as of 1996.  *See Acosta*, 83 F.3d at 1145–47.

9          In its decision in *Villanueva*, the Ninth Circuit clearly and succinctly outlined the facts

10  faced by the court in *Acosta* as follows:

11              In Acosta, an off-duty, plainclothes police officer chased on foot two
              men he believed had stolen a purse. Id. at 1144.  The men got into a
12              waiting, stopped car driven by Michael Acosta.  Id.  The officer, still
              in pursuit, positioned himself near the front of the car, standing closer
13              to the side than dead-center.  Id. at 1146.  The vehicle then began
              "moving or rolling very slowly from a standstill" toward the officer.
14              Id. at 1147.  The officer fired two shots into the car, killing Acosta.
              Id. at 1144.  We held that the officer violated the Fourth Amendment
15              and was not entitled to qualified immunity because "a reasonable
              officer could not have reasonably believed that shooting at the driver
16              of the slowly moving car was lawful," id. at 1148, as he "would have
              recognized that he could avoid being injured when the car moved
17              slowly [] by simply stepping to the side," id. at 1146.

18  *Villanueva*, 986 F.3d at 1171.  The conclusion reached by the court in *Acosta*—that an officer

19  who shoots at a slow-moving car when he can easily step out of the way violates the Fourth

20  Amendment—was recently reaffirmed by the Ninth Circuit in *Orn*.  In *Orn*, after a 15-minute

21  slow-speed pursuit, the driver of the car attempted to drive slowly—at approximately five miles

22  per hour—through a narrow gap between a police car and another parked car.  949 F.3d at 1173.

23  After clipping one of the police SUVs, an officer ran toward the driver's vehicle of the car and

24  began firing.  *Id.*  The Ninth Circuit held that the officer was not entitled to qualified immunity

25  because the facts were not distinguishable from those in *Acosta*.  *Id.* at 1179.  Notably, in *Orn* the

26  court held that "[i]f [the driver] was traveling at only five miles per hour as he maneuvered past

27  [the officer's] SUV, and *if he did not accelerate until after being shot*, a reasonable jury could

28  conclude that [the officer] lacked an objectively reasonable basis to fear for his own safety, as he

22

1  could simply have stepped back to avoid being injured." *Id.* (emphasis added).  Moreover, the

2  court in *Orn* specifically noted that the officer in *Acosta* "was standing in front of the suspect's

3  car 'closer to the side than the dead-center' . . . and the vehicle was 'moving or rolling very

4  slowly from a standstill as it approached him.'"  949 F.3d at 1179 (quoting *Acosta*, 83 F.3d at

5  1146–47).

6          When viewed in the light most favorable to the plaintiffs, the facts in this case are likewise

7  indistinguishable from those before the court in *Acosta*.[5]  Decedent Macias, like the drivers in

8  *Acosta* and *Villanueva*, did not accelerate toward the police car or Officer Mendoza before

9  Mendoza opened fire.  Indeed, if the disputed facts are resolved in plaintiffs' favor, the evidence

10 here would be even more compelling because not only did Macias allegedly not accelerate until

11 after being shot, but his truck was potentially completely stationary as opposed to slow-moving

12 when Officer Mendoza fired.  (Doc. No. 48-1 at 4.)  In light of the decision in *Acosta*, and on the

13 then-existing precedent upon which that decision was based, all reasonable officers would know

14 it is impermissible to shoot at a stationary or slow-moving car when they could simply step aside

15 to avoid any danger posed.  *Acosta*, 83 F.3d at 1146.

16          Defendant also cites to the decision in *Wilkinson* for the premise that the truck's moving at

17 a slow speed did not mitigate the risk to officers or the reasonableness of deadly force "used when

18 the suspect turned 'in close proximity' to officers on foot."  (Doc. No. 48 at 15) (citing *Wilkinson*,

19 610 F.3d 546.)  However, the facts in *Wilkinson* are again crucially distinct and distinguishable

20 from those presented here and "[do] not undermine the clarity of *Acosta*'s holding or its

21 application to this case."  *Villanueva*, 986 F.3d at 1172.  In *Wilkinson*, a fleeing minivan

22 temporarily came to a stop in a muddy yard after crashing into a telephone pole.  610 F.3d at 549.

23 --------

24 [5]  The court in *Monzon* distinguished *Acosta* because "[u]nlike the brief encounter that led to
   Acosta's death, the officers in [Monzon's case] attempted a traffic stop, witnessed the dangerous
25 and illegal driving of Monzon from the freeway to the dead-end street, and only fired when
   Monzon turned the van in their direction, accelerated toward them, and threatened their safety."
26 978 F.3d at 1163.  Of course, for the reasons summarized above, the decision in *Monzon* would
   not apply to the facts here because Macias engaged in none of those same dangerous activities.
27 But even if *Monzon* did apply, it would still be of no consequence to the defendant here with
   regard to clearly established law because *Monzon* was published well after the police shooting at
28 issue in this case.

1   Despite being surrounded by police vehicles as well as by two officers who were on foot, the

2   driver of the minivan continued his attempts to accelerate as made clear by the minivan's wheels

3   "spinning and throwing up mud." *Id.*  One of the officers approached the vehicle on foot and

4   attempted to open the driver's door but slipped and fell to the ground as the minivan began to

5   move in reverse. *Id.*  The engine revved and the wheels spun and threw up mud due to the

6   slippery conditions. *Id.*  As the minivan accelerated backward, it arced toward the driver's side,

7   leading a second officer to fear that the first officer on the ground had been run over and was in

8   danger of being struck again. *Id.*  The second officer began firing through the passenger-side

9   window of the minivan to protect both himself and the officer who he assumed to have been

10   downed. *Id.*  Based on these undisputed facts, the Ninth Circuit concluded that the officer who

11   fired the shots acted with an objectively reasonable basis due to his concern both for his own

12   safety as well as that of the officer who had fallen out of view. *Id.* at 551–52.  The court

13   specifically emphasized the revving of the van's engine and the fact that the van "could have

14   gained traction at any time, resulting in a sudden acceleration in speed." *Id.*  Here, as in

15   *Villanueva*, the "chaotic situation in *Wilkinson* has little relevance to the facts of either *Acosta* or

16   this case, which involve non-accelerating vehicles and officers who were standing on normal,

17   paved roads." *Villanueva*, 986 F.3d at 1172.

18        In ruling on the pending motion, the court is to determine "only 'whether, after construing

19   disputed facts and reasonable inferences in favor of [the plaintiff], [the defendant] is entitled to

20   qualified immunity as a matter of law.'" *Id.* (quoting *Thomas*, 818 F.3d at 874).  The Ninth

21   Circuit's decision in *Acosta* and its reaffirming decisions in *Orn* and *Villanueva*, clearly establish

22   that an officer violates a person's constitutional rights by shooting at a slow-moving or stopped

23   vehicle when the officer could reasonably have side-stepped to avoid any danger posed.

24   Accordingly, defendant's motion for summary judgment will be denied as to plaintiffs' Fourth

25   Amendment excessive force claim to the extent it is brought pursuant to the qualified immunity

26   doctrine.

27   /////

28   /////

24

**B.** **Whether Plaintiffs Have Presented Sufficient Evidence on Summary Judgment in Support of Their Claim for Loss of Familial Relations in Violation of the Fourteenth Amendment**[6]

In their third cause of action, plaintiffs assert that defendant Officer Mendoza violated their Fourteenth Amendment rights to a familial relationship. (Doc. No. 26 at 9–10.) Plaintiffs' claim for interference with familial relations is integrally based upon defendant Officer Mendoza's other allegedly unconstitutional conduct addressed above. *See Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004). However, to succeed on their Fourteenth Amendment claim, plaintiffs must meet a higher standard than the "objective reasonableness" standard applicable to their Fourth Amendment claim. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) ("The Supreme Court has made it clear . . . that only official conduct that 'shocks the conscience' is cognizable as a due process violation.") (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Plaintiffs must show that the defendant's conduct shocks the conscience. *Id.* "The relevant question . . . is whether the shocks the conscience standard is met by showing . . . deliberate indifference or requires a more demanding showing [of] a purpose to harm [decedent] for reasons unrelated to legitimate law enforcement objectives." *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1108 (N.D. Cal. 2017). "The lower 'deliberate indifference' standard applies to circumstances where 'actual deliberation is practical'" and the officer knew of a substantial risk of serious harm. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (quoting *Wilkinson*, 610 F.3d at 554); *see also Solis v. County of Los Angeles*, 514 F.3d 946, 957 (9th Cir. 2008) ("Deliberate indifference occurs when 'the official acted or failed to act despite his knowledge of a substantial risk of serious harm.'") (citation omitted). Whether a government official actually knew of a substantial risk "is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence," and a jury may so conclude "from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). "In

---

[6] Although defendant Mendoza seeks "qualified immunity with respect to all federal claims under the second prong" (Doc. No. 48 at 17), he has presented argument and supporting authority only as to plaintiffs' excessive use of force claim based upon the shooting of the decedent and has not addressed plaintiffs' Fourteenth Amendment claim. Accordingly, the court will not address the question of qualified immunity with respect to that latter claim. *See Figueroa v. City of Fresno*, No.1:15-cv-00349-DAD-BAM, 2017 WL 1255484, at *9 (E.D. Cal. Feb. 10, 2017).

1    circumstances where an officer cannot practically deliberate, such as when a snap judgment

2    because of an escalating situation is necessary, the purpose to harm standard applies." *Sommers*

3    *v. City of Santa Clara*, No. 5:17-cv-04469-BLF, 2021 WL 326931, at *11 (N.D. Cal. Feb. 1,

4    2021).  The key question here is "whether the circumstances are such that actual deliberation is

5    practical." *Porter*, 546 F.3d at 1137.  If so, then defendant's "deliberate indifference" may

6    suffice to shock the conscience.  *Id.*

7         "The Ninth Circuit has characterized opportunities to deliberate as existing along a

8    spectrum." *Wroth v. City of Rohnert Park*, No. 4:17-cv-05339-JST, 2019 WL 1766163, at *8

9    (N.D. Cal. Apr. 22, 2019).  "At one end of the spectrum are high-speed automobile chases, which

10   are always evaluated under the purpose-to-harm standard . . . [a]t the other end of the spectrum

11   are cases involving persons in custody where 'extended opportunities to do better are teamed with

12   protracted failure even to care.'" *Sommers*, 2021 WL 326931, at *11 (citing *Wroth*, 2019 WL

13   1766163, at *8; *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008); and *Porter*, 546 F.3d

14   at 1139).  Additionally, "[a] police officer cannot create the escalation that then justifies the use

15   of deadly force." *Sommers*, 2021 WL 326931, at *11 (leaving the question of whether an officer

16   had time to deliberate to the jury where, in the last 30 seconds of the interaction in question, the

17   suspect moved away from officers and defendant officer proceeded to jump over a wall, chase the

18   suspect down a path that left him cornered, and force the suspect into tight quarters, all while the

19   suspect was unarmed and where a jury could reasonably find that he did not make a threatening

20   movement toward the officer) (citing *Porter*, 546 F.3d at 1141).

21        As in *Sommers*, here there was no reason to believe decedent Macias was armed and a

22   reasonable jury could find from the evidence that he did not make a threatening movement toward

23   defendant Officer Mendoza before the officer fired, as discussed at length above.  *Id.*  Moreover,

24   the risk of substantial harm from firing four shots at the suspect was, of course, obvious.  Any

25   reasonable officer would know that shooting in the direction of a suspect's head four times in

26   quick succession poses a risk of substantial harm.  As mentioned above, the "deliberate

27   indifference" standard applies instead of the "purpose to harm" standard when an officer has

28   knowledge of a substantial risk of harm and where actual deliberation was practical.  *A.D.*, 712

F.3d at 453.  Having determined that the officer likely knew of a substantial risk of harm, the court next considers whether a jury could find that actual deliberation by Officer Mendoza was practical.  Although the total timeline of the events at issue in this case does not surpass more than a few minutes, the officers coordinated their decision to block decedent Macias in tight quarters despite the lack of probable cause to believe that a violent or serious crime had been committed.  The officers then immediately drew their weapons after Macias got into the driver's seat, moving to the front and rear of the truck as they did so.  Indeed, their weapons remained drawn for nearly an entire minute before the lethal force was deployed by defendant Mendoza. (Mendoza Dash Cam. 2:12–3:00.)  The officers took these actions despite Officer Mendoza's deposition testimony that the parking "was suspicious in nature but it was not illegal" and "[n]ormally we ask people to move their vehicles because of the violation[.]"  (Doc. No. 50-2 at 16, 18.)  Based upon the evidence before it on summary judgment, the court finds that a jury could reasonably conclude that, in the absence of demonstrable indications that Macias posed an immediate threat, the defendant officer had adequate time to deliberate before employing deadly force.  *See Ledesma v. Kern County*, No. 1:14-cv-01634-DAD-JLT, 2016 WL 6666900, at *15– 16 (E.D. Cal. Nov. 10, 2016); *cf. Ventura v. Rutledge*, 398 F. Supp. 3d 682, 699–700 (E.D. Cal. 2019), *aff'd*, 978 F.3d 1088 (9th Cir. 2020) (applying the "purpose to harm" standard instead of the deliberate indifference standard in case involving a quickly evolving situation where a third party was in imminent danger of being harmed in a domestic dispute as the suspect approached her, removed a knife from his pocket, and asked "Is this what you wanted?").

The court acknowledges that the situation here developed somewhat quickly and that whether to apply the deliberate indifference or purpose to harm standard is arguably a somewhat close call.  Nevertheless, "[h]ere, there is evidence to support both standards, and the determination should be left to the jury."  *Greer*, 229 F. Supp. 3d at 1108 (citing *C.E.W. v. City of Hayward*, No. 13-cv-04516-LB, 2015 WL 1926289, at *13 (N.D. Cal. Apr. 27, 2015)); *see also Garlick*, 167 F. Supp. 3d at 1169–70 (denying summary judgment as to the issue of whether defendant officers knew of and disregarded an excessive risk of serious injury or death); *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1274 (E.D. Cal. 2012) (denying summary judgment as to

a substantive due process claim where evidence tended to show that defendant officers encountered an unarmed and nonthreatening suspect).  In other words, the determination of whether it was practical for Officer Mendoza to deliberate instead of making a snap judgment call is a question of fact for the jury, so long as there is sufficient evidence to support both situations, as there is here.  *C.E.W.*, 2015 WL 1926289, at *13.  The jury's determination of these facts will determine which legal standard applies.

If a jury were to determine that Officer Mendoza had time to deliberate—such that the deliberate indifference standard applies—the court concludes that plaintiffs have come forward with sufficient evidence on summary judgment from which a jury could also find that defendant's actions shock the conscience given that defendant acted despite his knowledge of a substantial risk of serious harm.  *Solis*, 514 F.3d at 957.  Under those circumstances, plaintiffs would not be required to show that defendant Mendoza acted with a purpose to harm unrelated to any legitimate law enforcement objective.  *See Wilkinson*, 610 F.3d at 554 ("For example, a purpose to harm might be found where an officer uses force to bully a suspect or 'get even.'")  Regardless, the material facts underlying whether defendant Mendoza had time to deliberate remain disputed and cannot be resolved by this court on summary judgment.

Accordingly, because genuine disputes of material fact exist as to whether defendant Officer Mendoza's conduct shocks the conscience, defendant's summary judgment motion as to plaintiffs' Fourteenth Amendment claim will be denied.

**C.      Plaintiffs' Remaining State Law Claims**

1.      Bane Act Claim

Plaintiffs' sixth cause of action against defendant Officer Mendoza seeks relief under California Civil Code § 52.1, otherwise known as the Bane Act.  (Doc. No. 26 at 14.)  To prevail on a Bane Act claim, plaintiffs must show that defendant intentionally interfered with the decedent's civil rights via threats, intimidation, or coercion.  *Reese v. County of Sacramento*, 888 F.3d 1030, 1044 (9th Cir. 2018).  "'[T]he use of excessive force can be enough to satisfy the 'threat, intimidation or coercion' element of Section 52.1.'"  *Id*. at 1043 (quoting *Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 800 (2017)).  However, "the Bane Act [also]

1   requires 'a specific intent to violate the arrestee's right to freedom from unreasonable seizure.'"

2   *Id.* "[A] reckless disregard for a person's constitutional rights is evidence of a specific intent to

3   deprive that person of those rights." *Id.* at 1045 (citation omitted).

4          Applying the holdings of the appellate courts in *Reese* and *Cornell*, the court concludes

5   that defendant's motion for summary judgment as to plaintiffs' Bane Act claim must also be

6   denied.  First, as discussed above, the court has concluded that a reasonable jury could find that

7   Officer Mendoza acted unreasonably in his use of deadly force, which would satisfy the "threat,

8   intimidation, or coercion" element of the Bane Act.  *Reese*, 888 F.3d at 1044.  Second, also as

9   discussed above, there is a genuine dispute of material fact as to whether defendant Mendoza

10  acted with deliberate indifference toward decedent Macias.  If defendant Officer Mendoza acted

11  with deliberate indifference, then defendant likewise acted with reckless disregard for decedent

12  Macias' rights.  *Scalia v. County Kern*, 493 F. Supp. 3d 890, 903 (E.D. Cal. 2019) (finding that a

13  defendant's deliberate indifference would also qualify as reckless disregard for plaintiff's

14  constitutional rights).  Reckless disregard "is all that is necessary to demonstrate specific intent

15  under the Bane Act." *Id.*  Plaintiffs have thus sufficiently brought forth evidence on summary

16  judgment such that a jury could conclude that defendant specifically intended to deprive decedent

17  Macias of his constitutional rights via threat, intimidation, or coercion.  The court will therefore

18  deny defendant's motion for summary judgment with respect to plaintiffs' Bane Act claim.

19          2.     Negligence Claim

20          Plaintiffs' fifth cause of action is a state law negligence claim based on the alleged

21  wrongful death of the decedent.  (Doc. No. 26 at 14.)  Defendant concedes that "[w]hile such

22  claims are generally analyzed under the same reasonableness standard provided by federal law

23  . . . the California Supreme Court has now seemingly included an additional consideration of pre-

24  shooting tactics with respect to allegations of negligence."  (Doc. No. 48 at 21) (citing *Hayes v.

25  County of San Diego*, 57 Cal. 4th 622, 629 (2013)).  Defendant asserts that several federal courts

26  have "determined that a finding of reasonable conduct on the part of the officers under federal

27  law will generally result in a similar finding as to related state claims."  (*Id.* at 22) (citing *J.A.L. v.

28  Santos*, 724 Fed. App'x. 531, 534 (9th Cir. 2018)).  Of course, in this action the court has not

1   made any finding of reasonableness in connection with defendant Officer Mendoza's use of lethal

2   force under federal law.  Therefore, defendant's argument in this regard is unpersuasive.

3         Moreover, "[California] negligence law . . . is broader than federal Fourth Amendment

4   law." *Hayes*, 57 Cal. 4th at 639.  Because the court concludes that plaintiffs have come forward

5   with sufficient evidence with respect to their Fourth Amendment excessive use of force claim to

6   defeat summary judgment, the court likewise concludes that a reasonable jury could find that

7   defendant Officer Mendoza acted negligently based on the same evidence.  Accordingly, the court

8   will also deny defendant's motion for summary judgment as to plaintiffs' state law negligence

9   claim. [7]

10                                        **CONCLUSION**

11         For all of the reasons explained above:

12      1.     Plaintiffs' denial of medical care and *Monell* claims are dismissed pursuant to the

13             agreement of the parties;

14      2.     Defendant City of Delano is dismissed from the action without prejudice;

15      3.     Defendant's motion for summary judgment (Doc. No. 48) is denied as to all

16             remaining claims; and

17      4.     The parties are directed to contact Courtroom Deputy Mamie Hernandez at (559)

18             499-5652, or MHernandez@caed.uscourts.gov, within ten days of service of this

19             order regarding the rescheduling of the Final Pretrial Conference and Jury Trial in

20             this action.

21   IT IS SO ORDERED.

22      Dated:   **June 27, 2022**

23                                             UNITED STATES DISTRICT JUDGE

24

25

26

---

27   [7]  Neither party has presented any arguments with respect to plaintiffs' seventh cause of action, which is a survival action based on a battery claim.  Accordingly, the court does not address that

28   cause of action in this order.